

IN IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA
Alexandria Division

| | |
|---|---|
| UNITED STATES OF AMERICA ) | |
| ) | |
| v. ) | No. 1:22-CR- 00116 |
| ) | |
| SEIR ROBINSON HAVANA, ) | |
| ) | |
| Defendant. ) | |

## CRIMINAL INFORMATION

THE UNITED STATES ATTORNEY CHARGES THAT:

At all times material to this Information:

### INTRODUCTION

1. Defendant SEIR ROBINSON HAVANA ("HAVANA") was the Vice President/Director and Chief Executive Officer ("CEO") of MANA TAX SERVICES, INC ("MANA TAX").

2. MANA TAX purported to be a tax preparation firm organized in or about March 2018 under the laws of Hawaii.

3. The defendant was associated with, and controlled the bank account belonging to, Gulfstream Exchange Incorporated, later Gulfstream Exchange Inc. ("Gulfstream Exchange"), a Hawaiian Limited Liability Company created on or about April 5, 2018.

4. The defendant was also associated with, and controlled the bank account belonging to, Community Investment Corporation ("CIC"), a Hawaiian corporation created on or about June 1, 2018, and Seir & Sire, Inc., another Hawaiian corporation created on or about July 25, 2019.

5. Co-conspirator Quin Ngoc Rudin ("Rudin") was the Secretary, Director and Chief Financial Officer ("CFO") of MANA TAX. Rudin previously worked for the IRS as a Taxpayer Service Representative, in which role he provided administrative and technical assistance to individuals and businesses.

6. UCC-1 prepared and supervised others in the preparation of false tax returns for professional athletes and the preparation of false Paycheck Protection Program ("PPP") loan applications and supporting tax forms on behalf of MANA TAX.

7. UCC-3 was a mortgage loan broker who recruited small business owners that he met through his mortgage business to become clients of MANA TAX.

8. UCC-4 is self-employed in the entertainment industry including event promotion and publishing. UCC-4 also represented musical groups and performing artists. UCC-4 referred a number of his clients to become clients of MANA TAX.

9. The Internal Revenue Service ("IRS") was an agency of the United States Department of Treasury responsible for administering the federal tax laws of the United States and collecting taxes and due and owing to the United States.

10. An IRS Form 1040, U.S. Individual Income Tax Return, was the form filed by an individual to report, among other things, income, gains, losses, deductions, and credits. An IRS Form 1040-X, Amended U.S. Individual Income Tax Return, was a form an individual would file to correct a previously filed Form 1040.

11. IRS Form 940 is an Employer's Annual Federal Unemployment (FUTA) Tax Return that reports annual payroll costs. IRS Form 941 is an Employer's Quarterly Federal Tax Return that reports quarterly payroll costs. IRS Form 1120 is a U.S. Corporation Income Tax

Return that reports various types of income and expenses, including compensation to officers, salaries and wages.

*The Small Business Administration and the Paycheck Protection Program*

12. The United States Small Business Administration ("SBA") was an executive branch agency of the United States government that provided support to entrepreneurs and small businesses.

13. The mission of the SBA was to maintain and strengthen the nation's economy by enabling the establishment and viability of small businesses and by assisting in the economic recovery of communities after disasters. As part of this effort, the SBA enabled and provided for loans through banks, credit unions, and other lenders. These loans had government-backed guarantees.

14. The Coronavirus Aid, Relief, and Economic Security ("CARES") Act was a federal law enacted in March 2020 and designed to provide emergency financial assistance to the millions of Americans who were suffering the economic effects caused by the COVID-19 pandemic. One source of relief provided by the CARES Act was the authorization of up to $349 billion in forgivable loans to small businesses for job retention and certain other expenses, through a program referred to as the Paycheck Protection Program ("PPP"). In April 2020, Congress authorized over $300 billion in additional PPP funding.

15. The PPP allowed qualifying small businesses and other organizations to receive PPP loans. As part of the program requirements, businesses had to use the PPP loan proceeds for certain permissible expenses—payroll costs, interest on mortgages, rent, and utilities. The PPP allowed the interest and principal on the PPP loan to be entirely forgiven if the business spent the

3

loan proceeds on these expense items within a designated period of time and used a certain percentage of the PPP loan proceeds on payroll expenses.

16. In order to obtain a PPP loan, a qualifying business was required to submit a PPP loan application, which was signed by an authorized representative of the business. The PPP loan application required the business (through its authorized representative) to acknowledge the program rules and make certain affirmative certifications. In the PPP loan application, the small business (through its authorized representative) had to state, among other things, its: (a) average monthly payroll expenses; and (b) number of employees. These figures were used by the lender to calculate the amount of money the small business was eligible to receive under the PPP. In addition, businesses applying for a PPP loan had to provide documentation showing their payroll expenses, including IRS Forms 940, 941 and Form 1120. The lenders relied on the accuracy of the information contained in the PPP applications and supporting documents.

17. The SBA oversaw the PPP. However, individual PPP loans were issued by private, approved lenders who received and processed PPP applications and the supporting documentation, and then made loans using the lenders' own funds, which were 100% guaranteed by the SBA. Data from the application, including information about the borrower, the total amount of the loan, and the listed number of employees, was transmitted by the lender, or by a partner on the lender's behalf, via wire to the SBA in the course of processing the loan. The SBA used the E-Tran computer server located in Sterling, Virginia, within the Eastern District of Virginia, to process the applicant's data electronically to determine if a loan should be authorized. Similarly, after its review, the SBA used the E-Tran computer server located in Sterling, Virginia, to notify the lenders, or a partner on the lender's behalf, electronically if a loan should be funded.

18. The PPP loan application posed a number of questions and required the applicant to make a number of certifications including that the business was in operation as of February 15, 2020, that the PPP loan would be used to pay payroll, mortgage payments, lease payments, and utility payments as required by the PPP rules, and that all information in the application and supporting documents was true and accurate.

### *Relevant Financial Institutions*

19. Financial Institution-1 was a financial institution headquartered in Salt Lake City, Utah. Financial Institution-1 participated in the PPP as a lender, and, as such, was authorized to lend funds to eligible borrowers under the terms of the PPP. Partner-1, a partner to Financial Institution-1, assisted in the PPP loan process by receiving the PPP loan applications, reviewing the PPP loan applications and supporting documents, determining if the PPP loan criteria were met, and transmitting the PPP loan applications to the SBA, among other things.

20. Financial Institution-2 was a financial institution headquartered in Charlotte, North Carolina. Financial Institution-2 participated in the PPP as a lender, and, as such, was authorized to lend funds to eligible borrowers under the terms of the PPP.

21. Financial Institution-4 was a financial institution headquartered in New York City, New York. Financial Institution-4 participated in the PPP as a lender, and, as such, was authorized to lend funds to eligible borrowers under the terms of the PPP.

22. Financial Institution-6 was a financial institution headquartered in San Francisco, California. Financial Institution-6 provides banking services to the general public.

## COUNT 1
### (Conspiracy to Defraud the United States and to Commit Wire Fraud)
### 18 U.S.C. § 371

23. The allegations contained in paragraphs 1-22 of this Information are realleged as if fully set forth herein.

24. From in or about June 2019 through at least in or about July 2021, in the Eastern District of Virginia and elsewhere, defendant **SEIR ROBINSON HAVANA**, Quin Ngoc Rudin, unindicted co-conspirator 1 ("UCC-1"), unindicted co-conspirator 3 ("UCC-3), unindicted co-conspirator 4 ("UCC-4"), and others both known and unknown, did unlawfully, voluntarily, intentionally and knowingly combine, conspire and agree together and with each other to:

    a. defraud the United States for the purpose of impeding, impairing, obstructing, and defeating the lawful government functions of the IRS in the ascertainment, computation, assessment, and collection of federal income taxes; and

    b. commit wire fraud, in violation 18 U.S.C. § 1343 – that is, having knowingly devised and intending to devise a scheme and artifice to defraud, and to obtain money and property by means of materially false and fraudulent pretenses, representations, and promises, to transmit and cause to be transmitted by means of wire communication in interstate commerce writings, signs, signals, pictures, and sounds for the purpose of executing such scheme and artifice.

### The Objects of the Conspiracy

25. The conspiracy had two objects. The first object was to impede, impair, obstruct, and defeat the lawful government functions of the IRS of the Department of the Treasury in the ascertainment, computation, assessment, and collection of federal income taxes by preparing and

filing false tax returns on behalf of professional athletes seeking large tax refunds to which the athletes were not entitled. The second object was to devise and intend to devise a scheme and artifice to obtain money from financial institutions by submitting materially false applications for loans financed by the federal PPP and cause to be transmitted by means of wire communication in interstate commerce writings, signs, signals, pictures, and sounds for the purpose of executing the scheme and artifice to defraud, in violation of 18 U.S.C. § 1343.

26. It was a purpose of the conspiracy that the defendant and his co-conspirators obtained and tried to obtain large fees from the professional athletes for whom they obtained income tax refunds, for which the professional athletes were not entitled to receive, often in the amount of 30% of the refunds obtained. Additionally, another purpose of the conspiracy was for the defendant and his co-conspirators to enrich themselves by obtaining PPP loan funds for businesses they controlled, as the businesses did not qualify for the loan amounts sought and obtained. Finally, it was a purpose of the conspiracy that the defendant and his co-conspirators obtained and tried to obtain fees from the business owners for whom they obtained fraudulent PPP loans successfully, often in the amount of 30% of the PPP loans obtained.

**Manner and Means of the Tax Fraud Scheme**

27. Among the ways, manner and means by which the defendant and the co-conspirators accomplished the objects of the conspiracy included the following:

28. Rudin acted as an officer and director of MANA TAX which he had registered as a corporate entity under the laws of Hawaii in 2018.

29. The defendant and his co-conspirators represented that MANA TAX and Robinson & Associates were related companies and subsidiaries of Gulfstream Exchange and that the defendant was the CEO of Gulfstream Exchange.

30. The defendant and UCC-1 were the signatories on a bank account held in the name of MANA TAX, and the defendant was the signatory on a bank account held in the name of Gulfstream Exchange.

31. Rudin and UCC-1, through MANA TAX, assisted in the preparation and filing of false tax returns on behalf of a number of professional athletes, including some of whom lived and worked in the Eastern District of Virginia. These tax returns reported substantial, fabricated business losses and other false items in support of large claims for tax refunds from the IRS to which the athletes were not entitled.

32. Rudin not only assisted in the preparation and filing of original income tax returns for the professional athlete clients, but also filed amended income tax returns for past years to correct what he characterized falsely as "errors" the athletes' previous accountants made, many of whom, if not all, were Certified Public Accountants ("CPA").

33. Rudin supervised others, including several of his family members such as UCC-1, in the preparation of such tax returns.

34. Rudin and the co-conspirators effectuated the tax fraud scheme, in part, by claiming materially false and fabricated business and personal losses on the athletes' income tax returns. Additionally, for at least two of the professional athletes, the tax returns claimed exorbitant moving expenses and fabricated farm losses that the athletes did not incur.

35. The defendant worked to recruit professional athletes to have MANA TAX prepare their tax returns. Toward that end, the defendant, Rudin and the co-conspirators represented to the professional athletes that Rudin was knowledgeable and experienced in the preparation of tax returns. The defendant and Rudin represented that MANA TAX could obtain large refunds for the athletes and that Rudin had specialized knowledge that their prior CPAs and tax professionals did not have.

36. The defendant, Rudin and the co-conspirators communicated with the professional athletes when they had questions about their tax returns. In that regard, the defendant, Rudin and the co-conspirators would text, email, or have phone calls with the athletes about the preparation of their tax returns and claims for refund. Typically, Rudin would answer tax-specific questions for the athletes. Emails and text messages between the clients and the co-conspirators often included copies of prior tax returns, income information and the amount of tax refunds. These messages were sent to and from accounts held in the name of MANA TAX, Gulfstream Exchange and Rudin and HAVANA personally.

37. At least one conspirator discussed with Athlete-7 the possibility of him referring other professional athletes to MANA TAX for tax return preparation. At the conspirators' request, Professional Athlete-7 spoke to other professional athletes about MANA TAX on the phone, at their practice field in the Eastern District of Virginia, and via text messages. Some of these communications occurred while at least one of the athletes was in the Eastern District of Virginia.

38. MANA TAX charged and attempted to charge the professional athletes a fee of 30% of the tax refunds they obtained. In addition to recruiting the professional athletes, the

defendant would direct the athletes to make the payments to entities, other than MANA TAX, under his control in order to conceal the payments received. The defendant then caused these fees to be deposited into bank accounts for which he had signatory authority.

### Manner and Means of the PPP Fraud Scheme

39. Among the ways, manner and means by which the defendant and the co-conspirators accomplished the objects of the conspiracy included the following:

40. The defendant, UCC-3 and UCC-4 referred, and directed others to refer, business owners to MANA TAX and/or Gulfstream Exchange for the purpose of applying for PPP loans. The defendant told business owners that Gulfstream Exchange would mentor them and provide a variety of services on how to receive financial assistance, including applying for PPP loans.

41. The defendant and his co-conspirators offered to assist, via Gulfstream Exchange and MANA TAX, the business owners in applying for PPP loans often in exchange for a fee, which typically was 30% of the obtained PPP loan value.

42. The defendant knew that the information Rudin provided to prospective clients was wrong but the defendant vouched for Rudin to increase his credibility.

43. Rudin assisted in the preparation of fraudulent PPP loan applications for businesses claiming grossly inflated number of employees and grossly inflated monthly payrolls costs on the PPP loan applications.

44. The defendant and the conspirators communicated with one another and with prospective clients electronically by sending messages and documents about their efforts to obtain PPP loans.

45. Rudin used certain bank employees to facilitate the opening of new business bank accounts for MANA TAX clients in order to receive PPP funds.

46. The defendant and the conspirators told the business owners that in order to complete the PPP loan application, they would have to provide to MANA TAX their bank account login information, employee information and tax information for their businesses.

47. Rudin and MANA TAX did not review in detail the information provided in the PPP applications with the business owners who were seeking the PPP loans before the applications were submitted to the banks.

48. After the banks funded the PPP loans, the defendant and the co-conspirators often collected a 30% fee on behalf of MANA TAX from small business owners. The fee was based on the amount of the PPP loan that was funded.

49. Rudin usually instructed the co-conspirators to have the business owners obtain cashier's checks, made payable to entities other than MANA TAX, and to make false notations on the memo lines of the checks, such as "payroll."

50. The defendant and his co-conspirators knowingly submitted, assisted in the submission of, and caused to be submitted, at least 80 fraudulent PPP loans.

51. The defendant was listed as the applicant on a total of four (4) PPP loans that were funded by Financial Institution-1, Financial Institution-2 and Financial Institution-4. The applications were supported by false and fraudulent tax records prepared by MANA TAX. The loans totaled approximately $6.18 million. The lenders disbursed the loan proceeds into bank accounts the defendant controlled and held in the names of Gulfstream Exchange, CIC and

Company 36, a non-profit organization purporting to have its principal place of business in Leesburg, Virginia.

**Acts in Furtherance of the Conspiracy**

52. In furtherance of the conspiracy, and to effect the objects thereof, the following overt acts were committed within the Eastern District of Virginia and elsewhere:

53. On or about April 14, 2021, Rudin added himself as Secretary, Director and CFO of MANA TAX.

54. In or about May 2019, the defendant and Rudin met with Professional Athlete-7 in the Los Angeles area. During this time, Professional Athlete-7 agreed for MANA TAX to prepare his tax returns.

55. In or about June or July 2019, in Leesburg, Virginia, within the Eastern District of Virginia, the defendant, Rudin and UCC-1 flew on a private jet to meet with Professional Athlete-7. During this visit, at least one conspirator discussed with Professional Athlete-7 his tax returns and seeking millions of dollars in tax refunds from the IRS.

56. On or about the dates listed below, the defendant, through MANA TAX, and his conspirators, willfully aided and assisted in the preparation and presentation to the IRS of Forms 1040, U.S. Individual Income Tax Returns, and Forms 1040-X, Amended U.S. Individual Income Tax Returns, for the taxpayers and calendar years set forth below, among others, knowing full well that the returns were false and fraudulent as to material matters, in order to obtain refunds to which the taxpayers were not entitled, as follows:

| Taxpayer | Approximate Filing Date | Form | Year | Refund Issued |
|---|---|---|---|---|
| Professional Athlete 1 | 9/4/19 | 1040 | 2017 | $1,623,600 |
| Professional Athlete 2 | 10/15/19 | 1040 | 2018 | $4,559,703 |
| Professional Athlete 2 | 5/31/21 | 1040 | 2019 | $3,793,420 |
| Professional Athlete 3 | 10/16/20 | 1040 | 2019 | $1,888,888 |
| Professional Athlete 4 | 9/17/19 | 1040-X | 2018 | $481,299 |
| Professional Athlete 4 | 11/16/20 | 1040 | 2019 | $635,616 |
| Professional Athlete 5 | 11/30/20 | 1040 | 2019 | $1,325,326 |
| Professional Athlete 5 | 12/14/20 | 1040 | 2018 | $1,179,279 |
| Professional Athlete 7 | 11/30/20 | 1040 | 2019 | $4,081,626 |
| Professional Athlete 8 | 8/10/20 | 1040 | 2019 | $104,966 |
| Professional Athlete 9 | 10/13/20 | 1040 | 2019 | $458,511 |
| **Total** | | | | **$20,132,234** |

57. MANA TAX charged the professional athletes a fee of 30% of the income tax refunds obtained unlawfully. In that regard, the following professional athletes paid the co-conspirators at least the following fees:

| Taxpayer | Date Fee Paid | Refund Requested | Fee Paid |
|---|---|---|---|
| Professional Athlete 1 | 3/10/2020 | $1,623,600 | $480,000 |
| Professional Athlete 2 | 8/8/20 | $4,559,703 | $1,367,911.03 |
| Professional Athlete 3 | 1/4/21 | $1,888,888 | $566,666.70 |
| Professional Athlete 4 | 10/21/2020 | $481,299.00 | $144,389 |
| Professional Athlete 4 | 11/27/20 | $635,616 | $190,684 |
| Professional Athlete 5 | 1/11/21 | $1,179,279 | $403,933.80 |
| Professional Athlete 8 | 8/8/20 | $104,966 | $30,000 |

58. The defendant and the conspirators submitted, or caused to be submitted, the following PPP loan applications, among others, which had material false representations and which were relied upon by the financial institutions in authorizing the disbursement of loan proceeds:

13

| PPP Loan Applicant | Listed Authorized Representative | Date submitted (on or about) | Loan amount funded |
|---|---|---|---|
| Company 34 | Person U | 4/24/2020 | $273,437 |
| Company 1 | Person A | 5/5/2020 | $520,832 |
| Gulfstream Exchange Incorporated | SEIR HAVANA | 5/8/2020 | $1,752,130 |
| Mana Tax Services, Inc. | UCC-1 | 5/8/2020 | $730,932 |
| Company 48 | SEIR HAVANA | 5/13/2020 | $478,822 |
| Company 2 | Person B | 5/14/2020 | $776,040 |
| Company 49 | Person V | 5/15/2020 | $745,586 |
| Company 3 | Person C | 6/4/2020 | $703,391 |
| Company 4 | Person D | 6/5/2020 | $1,512,290 |
| Company 24 | UCC-4 | 6/15/2020 | $1,849,513 |
| Company 50 | UCC-4 | 6/15/2020 | $1,387,135 |
| Company 22 | Person W | 6/23/2020 | $1,838,222 |
| Company 51 | Person K | 7/20/2020 | $260,125 |
| Company 26 | Person X | 7/24/2020 | $1,151,571 |
| Company 5 | Person E | 1/25/2021 | $1,995,642 |
| Company 14 | Person K | 3/12/2021 | $831,952 |
| Company 39 | Person K | 3/13/2021 | $200,130 |
| Company 40 | Person K | 3/15/2021 | $211,250 |
| Gulfstream Exchange Incorporated | SEIR HAVANA | 3/17/2021 | $1,971,682 |
| Company 35 | UCC-1 | 3/17/2021 | $1,963,552 |
| Community Investment Corporation | SEIR HAVANA | 3/18/2021 | $1,979,812 |
| Company 31 | Person S | 4/11/2021 | $861,847 |
| Company 47 | Person K | 4/13/2021 | $500,035 |
| Company 29 | Person T | 4/14/2021 | $211,395 |
| **TOTAL** | | | **$24,707,323** |

59.     On or about May 8, 2020, Rudin applied for a PPP loan on behalf of MANA TAX for $730,932. Rudin listed his brother, UCC-1, as the applicant and claimed falsely MANA TAX had 125 employees and paid average monthly payroll of $292,373.

60.     On or about May 8, 2020, members of the conspiracy applied for a PPP loan on

14

behalf of Company 48 for $478,822. HAVANA was listed as the President and authorized representative. The application stated falsely that Company 48 had 180 employees and an average monthly payroll of $191,529. The co-conspirators included falsified bank statements and fraudulent tax records prepared by MANA TAX in support of this application.

61. On or about May 2020 date, the defendant, Rudin, and UCC-2 met with the owner of Company 4 to discuss Mana Tax preparing a PPP loan for Company 4.

62. On or about June 5, 2020, Rudin applied for a PPP loan on behalf of Company 4 for $1,512,290. Rudin claimed falsely that Company 4 had 443 employees and paid average monthly payroll of $604,916.

63. On or about June 12, 2020, the owner of Company 4 wrote a cashier's check to the defendant's company, Gulfstream Exchange Incorporated, for $453,687, which represented the 30% fee, for Company 4's PPP loan.

64. In or about the July or July of 2020, the defendant, Rudin, and UCC-2 met with the owner of Company 5 to discuss Mana Tax preparing a PPP loan for Company 5.

65. On or about January 25, 2021, Rudin submitted a PPP loan on behalf of Company 5 for $1,995,642. Rudin claimed falsely Company 5 had 263 employees and paid average monthly payroll of $798,257.

66. On or about February 25, 2021, the defendant collected a cashier's check from the owner of Company 5 made payable to the defendant's company, Summerwind Management, for $598,000, which represented the 30% fee, for Company 5's PPP loan.

(All in violation of Title 18, United States Code, Section 371.)

# COUNT 2
## (Money Laundering)
## 18 U.S.C. § 1957

THE UNITED STATES ATTORNEY FURTHER CHARGES THAT

67. The allegations contained in paragraphs 1-67 of this Information are re-alleged and re-incorporated into this count as if fully set forth herein.

68. On or about June 18, 2020, in the Eastern District of Virginia and elsewhere, defendant **SEIR ROBINSON HAVANA** did knowingly engage and attempt to engage in a monetary transaction in criminally derived property of a value greater than $10,000 that was derived from specified unlawful activity; that is, the conspiracy to defraud the United States and to commit wire fraud, as alleged in count 1 of this Information, and wire fraud, in violation of 18 U.S.C. § 1343.

69. More specifically, on or about June 18, 2020, the defendant obtained a cashier's check from Gulfstream Exchange's bank account at Financial Institution-6, which was made payable to Company 32 in the amount of $250,000. The source of these funds was the fees paid by Company 3 and 4 for their fraudulently obtained PPP loans. The defendant provided this cashier's check to UCC-3 for referring Company 3 and Company 4 to MANA TAX to obtain PPP loans.

70. The defendant and the co-conspirators opened new business bank accounts in the names of corporate entities to receive the proceeds of the PPP loan fraud scheme.

71. The defendant knew, but concealed from others, that co-conspirator Quin Ngoc Rudin, a convicted felon, was conducting and attempting to conduct financial transactions with the proceeds of crime by directing members of the conspiracy, including the defendant, to

become signatories to the bank accounts of MANA TAX, Gulfstream Exchange and other entities.

72. The defendant transferred and caused the transfer of fraudulently-obtained PPP funds to and through various business bank accounts he controlled.

73. The defendant instructed UCC-3 and others to mischaracterize intentionally the nature and purpose of the payments made for the benefit of the co-conspirators including by making false notations on the memo lines of cashier's checks that the payments were for "payroll" or "intercompany transfer."

74. The defendant withdrew approximately $1,004,800.00 in cash held in bank accounts for corporate entities he controlled and over which he had signatory authority and for whom MANA TAX obtained PPP loans fraudulently.

75. The defendant used credit cards obtained by UCC-3 and others for his own benefit and to conceal the use of criminal proceeds from the tax and PPP loan fraud schemes for personal expenses.

76. The defendant paid UCC-3 to recruit small business owners to MANA TAX to obtain PPP loans to which they were not entitled or in grossly inflated amounts.

(All in violation of Title 18, United States Code, Section 1957.)

## FORFEITURE NOTICE

Pursuant to Federal Rule of Criminal Procedure 32.2(a), defendant **SEIR ROBINSON HAVANA** is hereby notified that upon conviction of any of the offenses alleged in Counts 1 and 2 of the Criminal Information, **SEIR ROBINSON HAVANA** shall forfeit to the United States, pursuant to 18 U.S.C. § 981(a)(1)(C) and 28 U.S.C. § 2461(c), the defendant's interest in any property, real or personal, constituting or derived from proceeds traceable to the offense.

Pursuant to 21 U.S.C. § 853(p), **SEIR ROBINSON HAVANA** shall forfeit substitute property, if, by any act or omission of **SEIR ROBINSON HAVANA**, the property referenced above cannot be located upon the exercise of due diligence; has been transferred, sold to, or deposited with a third party; has been placed beyond the jurisdiction of the Court; has been substantially diminished in value; or has been commingled with other property which cannot be divided without difficulty.

(In accordance with Title 18, United States Code, Sections 981(a)(1)(C); Title 28, United States Code, Section 2461(c); Title 21 United States Code, 853(p); and Rule 32.2(a), Federal Rules of Criminal Procedure.)

JESSICA D. ABER
UNITED STATES ATTORNEY

Kimberly M. Shartar
Kimberly R. Pedersen
Assistant United States Attorneys
David Zisserson
Assistant Chief, Tax Division